## BRITTIN & ANDREWS VS. CRABTREE.

Although the defendant, in an action at law upon a writing obligatory, might prove that his signature was obtained by fraud, and thus defeat the action, he may, at his election, suffer judgment to go against him, and apply to a court of equity for relief. (1 *Eng.* 317, etc.)

It is a sufficient ground of relief in equity against a judgment at law upon a writing obligatory, executed by a surety only, that the promissory notes of other persons had been passed to the creditor, and received by him of the principal debtor, as an absolute payment, before such writing obligatory was executed—the obtaining the signature of the obligor, in such case, by deceiving him as to the fact of payment, was a fraud.

Where the charges in a bill are positively denied by the answer, and sustained by one witness only, for corroborating circumstances sufficient to overturn the answer, see opinion of the Court.

Where an objection to the competency of a witness arises from his own examination, he may be further interrogated as to facts tending to remove the objection.

*Appeal from Hempstead Circuit Court in Chancery.*

Hon. ABNER A. STITH, Circuit Judge.

WATKINS & GALLAGHER, for the appellants.

The statements of a defendant in his answer, directly responsive to the bill, or explanatory of matters there charged, relied upon and enquired about, and which are, of necessity, or from their nature, apparently within the personal knowledge of the defendant, are evidence in his favor. In other words, the rule laid down is that a decree cannot go against such answer, unless overturned by the testimony of two witnesses, or of one witness, with strong corroborating circumstances connected with the transaction. *Totten vs. Roberts,* 13 *Ark.* 699; *Jordan*

*vs. Fenno*, 13 *Ark.* 593; *Graham vs. Dunn et al.*, 17 *Ark.* 60; *Dodd vs. Spence, id.* 166; *Williams vs. Cheatham, ib.* 278.

It is submitted that a careful examination of the record will demonstrate that the bill is not proved, even if James D. Cobb was a competent witness for the complainant.

It is a rule in the law of evidence, that in a suit between the creditor and a surety, the principal, not a party to the record, and being clearly bound for the debt, may be a competent witness for the surety to exonerate or discharge him from liability, upon the principle that the principal debtor stands perfectly indifferent, his interest being equally balanced, because, whatever might be the result of that suit, he, being bound for the debt in any event, would have to pay it to one or the other of those contending parties. In this case, not only is there no fixed admitted liability of the principal debtor to the creditor, but the scope and tendency of his testimony is to exonerate *himself* from all such liability. Moreover, what, as it seems to us, makes the objection stronger in this particular case, is, that if the complainant, Crabtree, should have this debt to pay, a cause of action would thereupon accrue in his favor against the witness. But the creditor would have no recourse against the witness, because, obviously, as between *them*, the claim, pending this tedious litigation, is barred by limitation—and was so at the time when Captain Cobb testified.

There is also presented upon the record, a question of jurisdiction, which the Court may be called on to decide. All the grounds of relief relied upon in the bill were available to complainant, as defendant in the original suit at law, under the pleas of fraud, payment, and accord and satisfaction. He no where alleges, nor is there any reason to infer that these defences were not as well known to him then as now. There is no allegation of any want or loss of testimony, rendering it necessary to obtain a discovery. And if even that were so, since our statute authorizing either party to obtain a discovery in a suit at law, without resorting to chancery, mere discovery affords no ground of equity jurisdiction. *Williamson vs. King*,

1 *McMullan Ch.* 41; *Veech vs. Pennybacker,* 2 *Bibb* 326; *Cunningham vs. Caldwell, Hardin* 123; 1 *A. K. Marsh.* 479; *Thompson vs. Manly,* 16 *Geo.* 440; *Taylor vs. Buchan, ib.* 541. See, directly in point that the court has no jurisdiction where a discovery may be had in aid of proceedings at law, *Woodman vs. Saltonstall,* 7 *Cush.* 181. See, also, *Nelson vs. Dunn,* 15 *Ala.* 501; *Marsh vs. Edgerton,* 1 *Chand.* (*Wis.*) 198; *Ross vs. Buchanan,* 13 *Ill.* 55.

GARLAND for the appellee.

Where a party misrepresents a material part, or produces a false impression, intentionally, or to mislead another so as to take advantage of him, this is positive fraud, and relief will be granted in equity. 1 *Story's Equity* 201; *Shackleford vs. Hanly,* 1 *Marsh.* 500; *Neville vs. Wilkinson,* 1 *Bro. Ch* 545; 2 *Vesey* 15; and whether such representations be true or not, (9 *Vesey* 21; 13 *Ib.* 475; 1 *Story's Eq.* 202,) if it be a material part which was an inducement, (1 *Story's Eq.* 204,) and so much to the party's injury that he would have declined to contract had he known the true state of the case. *Bacon vs. Bronson,* 7 *Johns.* 201; *Cummins vs. Boyle,* 1 *J. J. Marsh,* 482; *Cates vs. Raleigh,* 1 *Mon.* 168; 1 *Green Ch. R.* 199; 4 *J. J. Marsh.* 393; *Huguemin vs. Basely,* 2 volume, part 2, *White & Ludor's (American) Ldg. Cases in Equity* 38, *et sequens; Earl of Oxford's Case, Ib.* 85. Where a party, by design, misrepresents a material fact, or produces a false impression to mislead, cheat, entrap, etc., this is positive fraud in the truest sense of the term, and against such equity will relieve. 1 *Story's Eq.* 191, 192, 193. If a party is proceeding at law, or on a bond, or other legal instrument obtained by fraud, or by means of any inequitable transaction, (as they did here on the bond in this case,) equity will interfere by injunction—also, any agreement founded on misrepresentation, or where any bond, promissory note, and the like, is obtained by unfair means; or where one party puts another under a mistake as to the terms of the contract. *Drewry on Injunctions* 1, 2, 3, 62, 63, *note g.; Eden on Injunctions* 20, 24; 1 *Mad-*

*doch's Ch.* 134,* 263;* *Hodgson vs. Murray,* 2 *Simons* 515; *Ib. Blain vs. Agar,* 295; *Fitzgerald vs. Stuart, Ib.* 342; *Fullagar vs. Clark,* 18 *Vesey* 480.

Although law might keep a party from paying the debt on a bond procured in this way, yet that is no reason why equity should lose its jurisdiction. See *Cases from* 2 *Simons, supra.*

The deposition of James D. Cobb is competent, for he is not interested in the event of the suit, nor can the record be read for him in any other proceedings. *Gresley's Eq. Ev.* 241, 249, 250, 251; *Ward vs. Wilkinson,* 4 *Barn. & Ald.* 410; *Nix vs. ————, 4 Taunt.* 18. If he has any interest, he should have been made a party. *Gresley's Eq. Ev.* 242. If the record could be used against him, and show his liability hereafter, by force of his deposition, it only adds to his competency. *Ib.* 222, 249. See, particularly, 6*th Paige* 76, *Wood vs. Skinner et al.*

Mr. Justice COMPTON delivered the opinion of the Court.

This was a bill in chancery, exhibited by William Crabtree, against Brittin & Andrews, to restrain them from further proceedings upon a judgment, recovered in an action at law, to which Crabtree made no defence, preferring to contest his liability in equity.

The bill charges that the judgment was recovered on a writing obligatory for the sum of $691 41, to which the signature of Crabtree was fraudulently obtained, under the following cir cumstances: The writing obligatory was drawn to cover what was stated by Brittin & Andrews, to be the indebtedness to them of one James D. Cobb, with whose daughter Crabtree had previously intermarried. The writing obligatory, which was drawn as a joint and several one, was brought to Crabtree by Brittin & Andrews, who represented that they had loaned Cobb money, and sold him goods, wares and merchandize, to the amount therein specified; and that Cobb being desirous to close his business, and adjust his indebtedness, with the view of leaving the State, had requested them to call upon Crabtree and ask him to sign the writing obligatory, as the security of

Cobb. Crabtree not suspecting a design to defraud him, and confiding in the representations of Brittin & Andrews, was thereby induced to execute the writing obligatory, without having a previous interview with Cobb on the subject. Upon seeing Cobb, however, shortly afterwards, he learned, for the first time, that the representations made by Brittin & Andrews were false and fraudulent; and that, at the time his signature was procured to the writing obligatory, the indebtedness of Cobb to Brittin & Andrews had been paid by his transferring to them certain promissory notes which they had accepted in payment.

Upon proceedings regularly had, the cause was heard, and the Court decreed that Brittin & Andrews be perpetually enjoined from further proceedings upon their judgment, and they appealed.

The first question of law presented, is as to the jurisdiction of the Court; and that has been well settled. Fraud is one of the acknowledged subjects of concurrent jurisdiction, and vitiates all contracts which are tainted with it, both in law and equity. And although the appellee could have established, in the action at law, that his signature to the writing obligatory was obtained by fraud, and have thus defeated the action, yet it was competent for him, at his election, to suffer judgment to go against him, and apply to a court of equity for relief. See *Hempstead & Conway vs. Watkins admr., etc.,* 1 *Eng.* 317, *and other decisions of this Court.*

So far as regards the merits of the controversy, upon the facts, it may be remarked that the charge in the bill, that the appellants represented to the appellee, that Cobb had requested them to ask the appellee to become his security in the writing obligatory, is not made out by the proof. If, however, the appellants received the promissory notes in payment of the indebtedness of Cobb, and afterwards by deceiving the appellee as to such payment, procured his signature to the writing obligatory for the same indebtedness, it was a fraud. In view of all the evidence adduced, this proposition, or ground of relief, is established, if it shall satisfactorily appear that the appel-

20

lants received the said promissory notes in absolute payment of Cobb's debt, and not, as is alleged in the answer, for collection merely, with the understanding that if collected, the proceeds should be so applied. Upon this question of fact the bill and answer are in positive conflict. The testimony of James D. Cobb is directly in point, and fully sustains the bill. Bearing in mind the rule of evidence that the answer must prevail unless overturned by the testimony of two witnesses, or of one witness with strong corroborating circumstances, we need refer to but one transaction, which bears upon the question at issue, and sufficiently corroborates the witness Cobb, and that is this: it is shown by the testimony that the appellants advanced Cobb the sum of $75 to enable him to remove to the City of Washington, for the payment of which the appellee was to become responsible—Cobb being insolvent. This item of $75 was embraced in the joint writing obligatory for $691 41, to which the appellee's signature was obtained, and when Cobb shortly afterwards refused to execute it on his part, alleging that his indebtedness to the appellants had been paid, and that he owed them nothing, they took the obligation of Cobb, with the appellee as his surety, for the same item of $75 alone. Why was this? It could not have been for the better security of the sum advanced, because Cobb was acknowledged to be insolvent, and without credit—the appellee was solvent and already bound for the same item in the writing obligatory previously executed, if that instrument was valid. This is a circumstance from which it may be inferred that the version of the matter given by the witness is the correct one, and that the appellants themselves doubted the successful collection of the writing obligatory.

But it is contended that Cobb is interested in the result of the suit, and therefore incompetent to testify. The ground of objection urged, is, that the appellee was bound as security, for the payment of Cobb's account with the appellants, which was closed by the writing obligatory, out of the execution of which the present litigation arose. If the record showed this to be

so, it would be necessary to discuss the question of competency in that view. Such, however, is not the state of case presented. There is no legitimate evidence in the record to this point, except what is contained in the deposition of the witness *himself*, who was interrogated by the counsel for the appellants, for the purpose of testing his competency. *Mr. Greenleaf*, in his work on evidence, *vol. 1, sec.* 422, states the rule to be, that " where the objection to the competency of the witness arises from *his own examination*, he may be further interrogated to facts tending to remove the objection, though the testimony might, on other grounds, be inadmissible. When the whole ground of objection comes from himself only, what he says must be taken together, as he says it. Thus, where his interest appears, from his own testimony, to arise from a written instrument, which is not produced, he may also testify to the contents of it; but if he produces the instrument, it must speak for itself. So, where the witness for a chartered company stated that he had been a member, he was permitted also to testify that he had subsequently been disfranchised. So, where a witness called by an administrator, testified that he was one of the heirs at law, he was also permitted to testify that he had released all his interest in the estate, etc.

An application of this rule to the statements of the witness, in the case at bar, shows that the objection to his competency is unfounded. He states in substance, that at the commencement of his dealings with the appellants the appellee was bound by verbal promise for the payment of his account to a limited amount; but that afterwards this responsibility was put an end to and ceased, so that the appellee was not bound for any portion of the account closed up by the writing obligatory.

Seeing no error in the record, the decree of the court below must be affirmed with costs.

In this opinion the Chief Justice concurs.

Opinion of Mr. Justice Rector:

At the May term of the Hempstead Circuit Court, appellant,

Brittin, recovered a judgment against appellee, Crabtree, on a promissory note, given by Crabtree to him, in the sum of $691 41, together with damages, costs, etc.

Execution followed the judgment—property levied on, etc—when Crabtree, having reserved his equity at the trial, filed his bill with prayer for injunction, making William W. Andrews a party, and alleging fraudulent inducements held out by Andrews in obtaining his signature thereto.

Which instrument is in the following words and figures, as appears from a copy appended to complainant's bill, and made a part thereof:

$691 41.
WASHINGTON, March 25th, 1851.

On or before the first day of January next, 1852, we promise to pay Benj. L. Brittin, or order, six hundred and ninety-one dollars and forty-one cents, with ten per cent. interest from date until paid, for value received.    Witness our hands and seals.

[Seal.]
WM. CRABTREE,    [Seal.]

Which note bears the following credit or endorsement:

Received July 7th, 1851, from Wm. Crabtree, seventy-five dollars on the within note, also $1,88—-76 88.

Appellants demurred to the bill—for equity—demurrer overruled, and appellants answered on the merits, and upon final hearing, the Chancellor decreed perpetual injunction, the cancellation of the note, and Brittin and Andrews appealed.

The bill alleges that the execution of the note sued on was obtained by fraudulent representations made to complainant by Andrews.    That Andrews, on presenting the note for his signature, informed him that he did so at the request of James D. Cobb, his father-in-law: that Cobb was desirous of leaving the State, and wished his store account with Benjamin L. Brittin, settled up; and that in signing the same, he, Crabtree, would incur only a nominal responsibility, as Cobb would shortly discharge the same, and that he would not be called on for the money, etc., etc.

That, with these assurances and representations, notwith-standing the fact that the note was a joint one, he signed the same, supposing that Cobb had requested him so to do, etc.

That shortly subsequent, however, Cobb came to him and assured him of the utter falsity of the statements of Andrews, and that he, Cobb, had made no such request. But on the con-trary, had refused to sign the note himself, because that the amounts formerly due by him to Brittin, had all been liquidated and settled.

The bill further shows that the said James D. Cobb had been for several years previous in the employment of the Trustees of the Male and Female Academy, at Washington, Arkansas, as superintendent and teacher, and that said Trustees, at the expiration of said Cobb's service, were indebted to him in the sum of one thousand dollars. That payment was delayed, suit instituted in the Hempstead Circuit Court, and judgment ob-tained for the amount.

That afterwards, in payment of said judgment, said Trus-tees assumed the payment of Cobb's indebtedness to Brittin; and that divers individual notes, amounting to $750, or more, were turned over by the Trustees to Brittin. That said notes were upon solvent men, and that Brittin collected some of the money due on the notes, the notes uncollected still remaining in his possession. And that in consummation of this arrange-ment, Cobb, by his attorney, entered satisfaction of the judg-ment against the Trustees: And Crabtree alleges that he had no notice of this arrangement, by the Trustees, to pay Brittin Cobb's debt, until after he signed the note, else he should not have done so. He further states that so soon as he was in-formed by Cobb of the fraud practiced upon him by Andrews, that he notified Andrews that he would not pay the note signed by him.

Crabtree denies that he paid the $76,88, credited on the note or that he acknowledged the justice of the note in any way.

These are the facts set out in the bill, but by no means ad-

mitted in the answers. Indeed the parties are so wide asunder that it is difficult to find a resting place between them.

Andrews says that he was and is still a silent partner of Brittin in the mercantile establishment: and that he obtained the signature of Crabtree to the note, but under circumstances entirely different from those stated by the appellee.

Brittin and himself, in their answers, state that James D. Cobb—the father-in-law of Crabtree, wished to take up goods in their store for the use of his family, etc. But that in consequence of the inability of Cobb to pay, he being in low circumstances, pecuniarily, they declined to extend him credit—when Crabtree agreed to become reponsible to them for such articles as Cobb and family might need. And that accordingly goods were furnished from time to time, together with $75 cash, loaned to Cobb, which was also at the instance of Crabtree. Which account for goods furnished and cash loaned, amounted to $691 41, for which the note in question was taken, with full knowledge of Crabtree as to the state of the accounts of Cobb, and in the absence of all fraud, etc.

That suit was instituted as alleged in bill and judgment obtained, etc.

They admit the receipt of the notes turned over by the Trustees, but insist that they were not taken as payment, but only as collaterals.

That a small amount was realized from the notes, after great diligence, which was credited to Cobb in former accounts, etc.

That the notes being given for the erection of a College House, and the house being abandoned by the Trustees, the notes were without consideration, and could not be collected. And that amongst the notes turned over, was one on Crabtree himself, for $300, which he refused to pay, etc.

That the $76 88 credited on Crabtree's note was paid by James Cobb for his father, and that they placed the credit on the note sued on, as they were bound to do, etc.

The depositions of Grandison D. Royston and J. S. Britt,

were taken on the part of the appellants, and those of James E. and James D. Cobb, on the part of appellees.

Britt deposes that he was the clerk of Brittin & Andrews, when the goods were sold, and money loaned to James D. Cobb. And that the bill, according to the books of the establishment, amounted to a sum corresponding with the amount of the note given by Crabtree. That James D. Cobb was without means, and that Crabtree became liable for his purchases, as he understood and was informed by his employers. But that he heard nothing from Crabtree to that effect.

Royston discloses that Brittin consulted with him as an attorney, as to the probability of collecting the notes turned over by the trustees, and that he gave it as his opinion that they could not be collected by law, and that such was the opinion of many members of the bar at Washington.

James D. Cobb deposes that he made a positive arrangement with Brittin, to take the notes spoken of as payment of his indebtedness. That the notes exceeded his accounts with Brittin, and that it was agreed that Brittin was to pay him for the excess $200, in money, and the remainder in goods. That the notes were delivered by the trustees to Brittin, and amounted to $762 28.

He says, as to the execution of the note for $691 41 by Crabtree to Brittin: he cannot even guess how Crabtree came to sign it, because he had previously informed Crabtree that his indebtedness to Brittin was settled. That about March, 1851, Andrews agreed to loan him $100, and that Crabtree was to become his security.

That about that time Andrews called him up into his counting room, and presented a note for him to sign, and stated that it was the note for the $100 loaned money. But upon examination he found it to be the note signed by Crabtree, for $691 41 and that he refused to sign it, etc.

That afterwards, he did borrow seventy-five dollars from Andrews, and gave his note for it, with Crabtree as security.

That, in the summer of 1851, he transmitted from the city of

Washington, to his wife, then in Washington, Arkansas, funds for the payment of the $75 loaned him by Andrews. That the assumpsit by Crabtree to Brittin, for him, was a verbal one, etc., etc. And that he is not bound to indemnify Crabtree, in case of the recovery by Brittin, and in all respects disinterested in the result of the suit between Brittin and Crabtree.

The evidence of James E. Cobb is, that in the summer of 1851, his mother gave him an eastern draft to pay a note or notes, in the hands of Brittin, against his father, James D.— That he accordingly paid $76 88, on a note for $75, signed by his father and Crabtree. And that Andrews then drew another note of his father's, given to a man in Clark county, for a horse; which Brittin & Andrews had traded for, which he also paid. That the two notes were delivered to him, etc., but does not know whether he destroyed them, or what became of them.

The first ground of defence occupied by the appellant is, that a defence at law was entirely adequate to the rights of Crabtree, and that his bill does not show a state of facts justifying the interposition of a Court of Chancery.

It is indeed difficult, in many cases, to draw the line of demarcation attempted to be recognized and perpetuated between the exercise of chancery and common law jurisdiction; and very much must depend, at last, upon the sound discretion of the Chancellor.

The general rule seems to be, however, that unless a court of law can dispense ample and complete justice, and attain the ends as well of morality as of legal right, a court of equity may, and ought of duty, to interfere. It is argued in this case that a plea putting in issue the verity of the note if fraudulent, would defeat its collection. And of this, particularly under our statute, I entertain no doubt.

But to defeat an action brought upon the instrument, would only be one step taken by Crabtree for his security, for future exigencies might require him to go much further, and beyond this a court of law is found powerless—it can give no indemnity for the past, nor security for the future.

For although no recovery is had, and the first action may be plead in bar of a second, still the note is in existence, and may in various ways, subject the maker to harrassment, pecuniary and moral.

The object of the bill is not only to prevent the collection of the note, but to obtain its cancellation, and blot it out of existence, as it ought to be if obtained by collusion and fraud.

To ascertain its invalidity and fraudulent intent, and nevertheless procrastinate its existence, which is all a court of law could do, would not so well subserve the ends of justice—the rights of Crabtree, nor public morals; as to procure its annihilation by a Court of Chancery, if it really exists by fraudulent procurement. If it was obtained by dishonesty, it not only ought not to be collected, but can, by its future preservation, answer neither private nor public good.

In the case of *Hamilton vs. Cummings*, 1*st Johnson's Ch. R.* 517, this question was examined at length by Chancellor Kent, from which high authority, corroborated by the cases therein cited, I feel fully warranted in saying that a court of equity has a right, and ought to take cognizance of such cases as the one before us.

In *Bromley vs. Holland*, 7 *Vesey*, 3, Lord ELDON, holding in favor of the exercise of Chancery power, in such like cases, remarks, " That it was not unwholesome that an instrument should be delivered up, upon which a demand may be vexatiously made, as often as the purpose of vexation may urge the party to make it."

And he seemed to think that the question had become settled by a series of decisions, in favor of the authority of the Court to direct instruments to be delivered up though they might be void at law.

In *Hamilton vs. Cummings*, and other cases referred to by Mr. Kent, no recovery had been sought thus far on the instrument, but were only held *in terrorem* to the annoyance of the parties, cripling their credit, and preventing a safe and final settlement of estates.

In the case before us, protection from some quarter is impe-
riously demanded, to prevent an unrighteous execution of a
judgment, obtained, as alleged by complainant below, upon an
instrument grossly fraudulent, and utterly subversive of every
principle of honesty and fair dealing.

I think then that Crabtree might well elect upon the face of
his bill to call into requisition the aid of a chancellor to enquire
of the truth or falsity of his allegations against Andrews &
Brittin, the appellants. It remaining still necessary for his
relief that he should make out his case from the facts disclosed
in the pleadings and evidence.

The bill and answers, it is not difficult to see, are upon the
material facts totally repugnant and contradictory.

The latter, as between the two, taking precedence, the
remaining question is, does the proof countervail the answer,
and support the allegations in the bill.

The testimony of James D. Cobb is, that Brittin took the
notes turned over by the trustees as payment.

And whether an assignment would, in law, constitute pay-
ment or not, is immaterial, if such was indeed the contract—
they must in this case be so regarded, and cannot be treated as
collaterals; for Brittin had as well a right to take notes as
money for his debt, or to take nothing at all if he chose.

But neither of the other witnesses touch this point in the
case directly; and the familiar rule being that an answer under
oath, unless contradicted by two witnesses, or one witness
strongly corroborated by circumstances, must prevail, let us
enquire if the circumstances are to be found in the record
sustaining the declarations of James D. Cobb.

And these circumstances may as well be deduced from the
answer itself, as from others of the pleadings. As, for instance,
no presumption can be indulged in favor of an answer that is
inconsistent or self-contradictory.

The appellants set out with the proposition that the goods
and moneys furnished to Cobb, was upon the exclusive respon-
sibility of Crabtree—in so much as Cobb was a man of no

pecuniary responsibility whatever, and that his name or signature was worth no more than a piece of blank paper.

That Crabtree directed them to let Cobb have what goods he wanted, and that he would pay for them.

That preceding the execution of the note by Crabtree they showed the accounts of Cobb to Crabtree, and he agreed to give his own obligation in payment of them.

Observing these statements of appellants, how poorly are they corroborated by the fact, that the obligation prepared in liquidation of Cobb's accounts and signed by Crabtree, was a joint obligation, contemplating the importance of the signature of Cobb, and which Cobb says he was afterwards requested to sign, but refused.

Certain it is, also, by their own admissions, that they had looked to Cobb for payment, and not exclusively to Crabtree, by receiving, even as collaterals, the notes turned over by the Trustees.

Besides this, the answer is put under the ban of suspicion by its declarations in another particular.

It states that the $75 cash borrowed, made up a portion of Cobb's account, for which Crabtree gave his note, whilst it is manifest from the testimony of the Cobbs that a separate note was given for that amount, with Crabtree as security.

James D. Cobb says that the seventy-five dollars was obtained by him from Andrews after Crabtree had executed the note for $691 41.

James E. Cobb testifies that he paid the seventy-five dollars borrowed money in the summer of 1851, and took up the note with Crabtree as security.

Then it is clear that if these statements reflect the truth, as to the $75 item, it could not have been properly included in the note given by Crabtree to Brittin; because the money was subsequently obtained, and a separate obligation taken.

But if on the other hand, the money was obtained before the execution of the $691 41 note, then it was not proper that Crabtree should give his note again for moneys included in a

former obligation, and for this reason, putting all others out of view, the note sued on by Brittin must be held fraudulent and void.

Beside this, the appellants assuming that the name of James D. Cobb was utterly worthless in a pecuniary point of view, is not sustained very well in the fact that they had traded for an outstanding note on Cobb, belonging to another party, and demanded and received payment for the same.

Thus the circumstances corroborating the testimony of the single witness, James D. Cobb, and deduced from appellants' answer, is sufficient in our opinion to countervail the facts made in the answer, and support, in a sufficient degree, the allegations of complainant's bill: that the note for $691 41 was obtained by fraudulent pretence and misrepresentation.

And, in this view of the case, it becomes wholly immaterial whether Crabtree assumed to pay Cobb's debt or not; he cannot be held to answer upon two obligations for the same amount.

Nor is it material whether the Academy notes taken by Brittin from Cobb were regarded as collaterals or payment, the result as to the note now in question must be the same.

Objection is urged by appellants against the admissibility of James D. Cobb's testimony, upon the ground of interest in the present suit. But I think without grounds to sustain it: because, if for no other reason, lapse of time would preclude a recovery against him by Crabtree.